UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
          UNITED STATES OF AMERICA,

                  - v. -                                11 Cr. 409 (PAE)

          STEFAN GILLIER,

                       Defendant.
------------------------------------------------------x

# GOVERNMENT'S SENTENCING MEMORANDUM

                                                              DAMIAN WILLIAMS
                                                              United States Attorney for the
                                                              Southern District of New York
                                                              Attorney for the United States of America

Micah F. Fergenson
Dina McLeod
Assistant United States Attorneys

      - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- x
    UNITED STATES OF AMERICA,

           - v. -                                 11 Cr. 409 (PAE)

    STEFAN GILLIER,

                      Defendant.
------------------------------------------------------- X

## GOVERNMENT'S SENTENCING MEMORANDUM

On September 28, 2022, a jury convicted defendant Stefan Gillier of conspiracy, mail fraud, wire fraud, interstate transportation of stolen property and money laundering. For years, the defendant duped victim-companies into sending him valuable aircraft parts that he never paid for.

To reflect the seriousness of the defendant's conduct, to promote just punishment and respect for the law, and to deter the defendant and others like him, the Government respectfully requests that the Court impose a below-Guidelines sentence of no less than 120 months' imprisonment, which would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

### I.    THE OFFENSE CONDUCT

The Court has before it a well-developed record that establishes the defendant's participation in a multi-year conspiracy to defraud victim-companies of aircraft parts. That record also contains evidence that the defendant knowingly defrauded and deceived Honeywell—including through the use of alter ego personas and companies—and continued to brazenly lie to Honeywell after it discovered the fraud.

1.  **RTF International**

Defendant Stefan Gillier and his co-conspirators used a web of interrelated businesses, aliases, and office locations to perpetrate a scheme to fraudulently obtain millions of dollars of aircraft parts through a stopped check scheme, and then to resell those parts for personal profit. RTF International Inc. ("RTF") was the principal entity employed in the scheme's early period, and Honeywell International Inc. ("Honeywell") was RTF's principal victim. RTF was originally incorporated in 1999 by (now deceased) co-conspirator Faramarz Rafii Tari. As of 2004, the defendant held himself out as the president of RTF and ran its day-to-day operations.

Gillier—acting through RTF and using the alias "Roland Van Gorp"—began placing orders for airplane parts with Honeywell in 2004. Between 2004 and 2006, RTF ordered and received over $8 million in airplane parts from Honeywell, as reflected in Honeywell invoices generated at the time of those parts' shipment to RTF. As payment—or purported payment—RTF sent checks to Honeywell, almost all of which were issued from two checking accounts at the Royal Bank of Canada ("RBC") in the name of RTF. Gillier was the sole signatory of both RBC accounts and his distinctive signature appears on the checks sent to Honeywell. The aggregate value of the checks sent to Honeywell exceeded $16 million—nearly double the cost of the parts that RTF ordered. But over $15 million worth of the checks were the subject of stop payments, as Gillier instructed RBC to stop payment on over 500 of the RBC checks (*See* Tr. at 1100-01). Thus, while appearing (at least for a time) to have overpaid Honeywell, RTF actually paid Honeywell less than $1.5 million in good checks, in effect stealing over $6 million in airplane parts.

Honeywell did not detect the stopped check scheme until the volume of orders and stopped checks increased substantially in early 2006, when Gillier began ordering, and stopping payment on, millions of dollars worth of checks every month. After being alerted in March 2006 to millions

of dollars in debits—which included debits related to the conversion of USD to CAD as well as stop payments—Honeywell personnel began communicating with RTF's listed contact, "Roland Van Gorp," an alias used by Gillier. A Honeywell Aerospace Credit Manager, William Doughty, communicated with Gillier (who was using the name "Roland") over several weeks, into early May 2006, about the issue and sent "Roland" relevant records concerning the stop payments and foreign currency adjustments. "Roland" claimed ignorance of the issues, repeatedly claimed to be working on the problem with his finance department, and continually promised to provide answers. Ultimately, "Roland" did not provide the information he promised and ceased communicating with Doughty except for voice messages left on Doughty's desk phone at times outside of working hours.

After learning of the millions of dollars in RTF stop payments, Honeywell placed a credit hold on RTF's account at the end of March 2006 to cease further shipments. In response, Gillier attempted to continue the scheme using another entity, Alberta Aerospace Services ("AAS"). In early April 2006—that is, shortly after Doughty spoke with "Roland" regarding the stop payments—AAS submitted a credit application to Honeywell signed by a representative of AAS named Harrison Mirtar. As with RTF's credit application, AAS listed CIMA and ASAP as credit references (albeit, with inconsistent details). In addition, the AAS application appended a purported earnings statement for the year ended January 31, 2006, indicating that it had done over $11 million in sales. That statement was patently fraudulent, as AAS had not been incorporated until January 30, 2006. Having identified the apparent connection between AAS and RTF, Honeywell did not ship parts for any AAS orders—for which AAS had sent checks bearing Gillier's same distinctive signature.

### 2. Honeywell's 2006 Civil Seizure and the Defendant's Departure from the United States

After discovering the fraud, on June 14, 2006, Honeywell executed a civil attachment order at two locations in Kansas: the warehouse and office of a company called Doha Aerospace (the "Doha Warehouse") and Gillier's personal residence (the "Gillier Residence"). Pursuant to the attachment order, which was authorized by a judge in the District Court of Johnson County, Kansas, a court officer and several Honeywell employees took possession of a large amount of property located at the Doha Warehouse and the Gillier Residence. The seized property included a significant number of aircraft parts (the majority of which had been fraudulently purchased from Honeywell). Numerous documents were also seized, including records relating to RTF, AAS, CIMA, and Doha. The total value of the aircraft parts seized from the Doha Warehouse was later appraised at over $6 million.

The defendant was present at the Doha Warehouse during a portion of the civil search and seizure on June 14, 2006. During the execution of the attachment order, the defendant was served with, among other things, the attachment order itself, a summons notifying him that "an action has been commenced against you" by Honeywell and directing him to file an answer, and Honeywell's petition (i.e., the civil complaint). The next day, June 15, 2006, the defendant left the United States on a flight from LaGuardia Airport to Montreal, Canada. He did not return to the United States until his extradition from Italy.

On the day of, and in the days immediately after, the civil enforcement action, the defendant also began transferring large sums of money from RTF's bank accounts to his own bank account and to other accounts he controlled. Specifically, on June 14, 2006, the defendant: (1) transferred $40,000 from RTF's Merrill Lynch account to his own Merrill Lynch account; (2) transferred $40,000 between his Merrill Lynch account and his Commerce Bank account; and (3) transferred

$20,000 from RTF's HSBC bank account to his own Merrill Lynch account. The day after the execution of the attachment order, June 15, 2006, the defendant directed that the remaining balance in RTF's Merrill Lynch account be transferred to a Citibank account held jointly in his name and his mother's name (Lydie Van Gorp) (the "Gillier/Van Gorp Citibank Account").

A number of subsequent incoming wire transfers (including an approximately $58,100 wire transfer from Gillier on June 16, 2006, and an approximately $7,000 wire transfer from RTF's Merrill Lynch account on June 21, 2006) brought the balance in the Gillier/Van Gorp Citibank Account to approximately $100,000. Once the funds were consolidated in the Gillier/Van Gorp Citibank Account, a series of large wire transfers completely emptied the account. Specifically, between June 23, 2006 and June 27, 2006, three outgoing domestic wire transfers and one outgoing international wire transfer emptied almost all the entire balance of the Lydie Van Gorp Account Stefan Gillier testified that these wire transfers were used to pay legal fees associated with the civil lawsuit.

### 3. Honeywell's Lawsuits Against Gillier

Civil litigation followed the issuance and execution of the Kansas attachment order.[1] As noted, Gillier was present during the civil seizure executed at the Kansas Warehouse and was personally served with Honeywell's petition filed in Kansas state court. That petition described in detail Gillier's stopped check scheme and the web of interrelated companies, aliases, and purported office locations that Gillier and RTF used to effect the scheme (Tr. at 406-07). The petition was

---

[1] In addition to the civil action in Kansas state court, also on June 14, 2006, Honeywell filed lawsuits in the United States District Court for the Southern District of New York (the "SDNY Litigation") and in Montreal, Canada (the "Canada Litigation"). In February 2007, Gillier filed for bankruptcy on behalf of RTF in Canada—which he later used in an attempt to avoid satisfying the Kansas judgment.

5

supported by several affidavits, including affidavits from Honeywell's Chief of Security and Doughty (the Credit Manager who communicated with "Roland Van Gorp").

After being served and immediately thereafter fleeing the country, Gillier never again voluntarily appeared in the United States. In particular, Gillier failed to appear—individually and as the corporate representative for each of the corporate defendants (namely, RTF, AAS, and Doha Aerospace Services ("Doha"))—for noticed depositions on four separate occasions.

### 4. The Conspiracy Continued at UAS

Beginning in spring 2006, the defendant's co-conspirator, Faramarz Rafii Tari, submitted a series of lease applications for an apartment at Trump World Tower in Manhattan ("Manhattan Address-1"). As part of one application, Stefan Gillier and his alias "Roland Van Gorp" were separately identified as personal references. Both Gillier (as President of Doha) and "Van Gorp" (as Vice-President of RTF International) submitted signed letters in support of Rafii Tari's application. The defendant also remitted two checks—each in the amount of $8,750—as the first and last month's rent, and four additional checks in smaller amounts for various fees associated with the rental. All of these checks were drawn from RTF International's account at HSBC.

The apartments became the operating location for UN Air Services, Inc. ("U.A.S."). Rafii Tari incorporated U.A.S. in the state of Delaware. U.A.S., like RTF, was a reseller of aircraft parts and components and used apartments at Trump World Tower as shipping and billing addresses. In 2007 and 2008, U.A.S. shipped seven different packages to the defendant at his address in Montreal.

U.A.S. proceeded to defraud victims in the same manner as RTF. For example, in the fall of 2007, U.A.S. began purchasing aircraft parts from the aircraft part manufacturer Pratt & Whitney. As with RTF, U.A.S. initially paid for the products it purchased from Pratt & Whitney

6

but eventually stopped payment on certain checks. As a result, U.A.S. owed over $100,000 to Pratt & Whitney for various aircraft parts that it had purchased. Pratt & Whitney spent months attempting to collect payment from various U.A.S. employees, who repeatedly and falsely claimed that payment had been made or were forthcoming. U.A.S. never paid their outstanding bills.

On or about March 3, 2010, law enforcement agents with the U.S. Department of Homeland Security executed a search warrant at the apartments used by Tari and located at Trump World Tower. Law enforcement seized a number of aircraft parts and documents, including evidence that Gillier had, in 2008, ordered aircraft parts from U.A.S. and that U.A.S. had shipped aircraft parts to Gillier's home address in Montreal, Canada.

## II.     THE GUIDELINES RANGE

The Probation Department calculated the Guidelines range as 151 to 188 months' imprisonment. (PSR ¶ 103). This calculation is in accord with the Government's calculation, with the exception that the Government submits that a two-level enhancement for obstruction of justice is appropriate. The Probation Department, deferring to the Court's judgment, does not take a position on this enhancement. (PSR ¶ 60).

The defendant does not dispute the Guidelines calculation in the PSR, except to object to the obstruction of justice enhancement. (Def. Mem. at 7). For the reasons that follow, an obstruction of justice enhancement is warranted, and the appropriate Guidelines range is, therefore, 188 to 235 months' imprisonment.

### A.     An Obstruction of Justice Enhancement is Warranted

Gillier attempted to obstruct and impede justice during his trial when he testified in his own defense and committed perjury in the process. Under Section 3C1.1 of the Sentencing Guidelines, this conduct should result in a two-level enhancement in the calculation of the defendant's

Guidenes sentencing range. The Court should also consider this conduct in its evaluation of the 18 U.S.C. § 3553(a) sentencing factors.

The defendant testified at trial in his own defense over the course of two days. The thrust of his testimony was that he lacked the requisite knowledge and intent to be guilty of any wrongdoing. During his testimony, the defendant made numerous materially false statements that constitute perjury and warrant the application of the obstruction-of-justice enhancement. Indeed, a number of matters about which the defendant testified were directly contradicted by ample evidence at trial and by the jury's verdict.

### 1. Applicable Law

Section 3C1.1 of the Guidelines provides for a two-level enhancement if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1. This provision applies to a defendant who commits perjury, or who provides "materially false information to a judge or magistrate." *Id.*, comment. (nn. 4(b), 4(f)).

Where the Government moves for a Section 3C1.1 enhancement based on a defendant's perjured testimony, "a sentencing court must find that the defendant 1) willfully and 2) materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." *United States v. Zagari*, 111 F.3d 307, 329 (2d Cir. 1997). To satisfy the willfulness requirement, the Government must prove that "the defendant's statements unambiguously demonstrate an intent to obstruct." *United States v. Kelly*, 147 F.3d 172, 178-79 (2d Cir. 1998). The commentary to Section 3C1.1 further defines "material" evidence to mean "evidence, fact, statement or information that, if believed, would tend to affect or influence the issue under determination." U.S.S.G. § 3C1.1, comment. (n.6).

8

In the case of a defendant's trial testimony, perjury may be established by testimony inconsistent with the jury's verdict. As the Second Circuit explained in *United States v. Bonds*, 933 F.2d 152 (2d Cir. 1991), it is appropriate to regard the jury's verdict as having "necessarily determined" the intentional falsity of a defendant's testimony when: (1) the defendant testified that he lacked guilty knowledge; and (2) the jury subsequently convicts the defendant. *See id.* at 155. Moreover, where the false testimony "concern[s] [the defendant's] own state of mind – a matter about which he was peculiarly knowledgeable" – it is "reasonable to conclude" that the defendant "was aware, at the time of testifying, that his statements were untrue." *See id.*

Finally, it is well settled that "the obstruction of justice enhancement [under Section 3C1.1] . . . is mandatory once its factual predicates have been established." *United States v. Friedman*, 998 F.2d 53, 58 (2d Cir. 1993); *accord United States v. Ortiz*, 251 F.3d 305, 306 (2d Cir. 2001). Accordingly, if the sentencing judge finds facts that give rise to this enhancement, the enhancement must be imposed.

2. Discussion

At trial, Gillier took the stand to testify in his own defense and testified falsely regarding key events at issue during the trial. During his testimony, Gillier made a series of admissions regarding his involvement in the criminal scheme. Specifically, Gillier admitted to the following:

- Gillier sent and signed hundreds of checks to Honeywell for aircraft parts that were ordered from them (Tr. at 931);
- Gillier stopped payment on the checks sent to Honeywell from RTF (Tr. at 936-937).

Although Gillier made these significant admissions, Gillier intentionally testified falsely and committed perjury when he testified about the following:

- Gillier testified that when he stopped payment on checks to Honeywell, he never intended that Honeywell would not be paid for the parts. (Tr. at 938 ("Q: When

9

payment was stopped on the checks that we've been talking about, was it ever your intention not to have Honeywell paid for the parts that they sent to RTF? A: Never.")). This testimony is inconsistent with the jury's verdict that the defendant knowingly defrauded Honeywell; the very purpose of the fraud was to take the parts without paying.

- Gillier testified that he always believed the parts were paid for based on supposed statements from co-conspirator Faramarz Rafii Tari that Tari was sending wire payments to Honeywell. (Tr. at 933-34 ("Q: Without going further at the moment, was it your belief that the Honeywell parts that had been ordered while you were at RTF had been paid for? A. It was always what I thought. My belief was -- what I thought, that everything was paid, always, always, always.")); (Tr. at 936 ("Q. Did RTF ever send wire transfers to Honeywell for parts that were ordered? A. I always thought yes because Tari repeated to me thousands of times that he sent the money by wire transfer.")). In fact, Gillier alone controlled the relevant bank accounts and any payments (and stopped payments) to Honeywell, received the monthly bank account statements for the relevant bank accounts, and knew that there were no outgoing wire payments being made to Honeywell.

- Gillier testified that he sent certain checks to Honeywell in order to learn whether parts were in stock. (Tr. at 937). In fact, there is no need to send a check to Honeywell to learn if parts are in stock at Honeywell (Tr. at 159), and Gillier sent such checks—knowing that he would stop them prior to clearance—in order to artificially inflate the credit on RTF's account at Honeywell.

- Relatedly, Gillier testified that he stopped payment on certain checks to Honeywell because those parts were not in stock. In fact, Gillier stopped payment on those checks without regard to whether parts were in stock—or even whether they had already been delivered to Gillier. For example, Gillier testified that he stopped payment on approximately 18 checks on March 17, 2006 because the parts were not in stock. (Tr. at 939). In fact, those parts were shipped to Gillier's apartment and had arrived at his house prior to the stopping of the checks. (See Tr. at 1178-79 (Government Summation)). At least one of those parts weighed over 300 pounds (*Id.*)

- Gillier testified that he never intended to confuse Honeywell. (Tr. at 1000 ("Q: Did you ever intend to send checks for amounts that were very different than the invoice number or purchase order number in order to confuse Honeywell? A: My goal has never been to be any confusion.")); Tr. at 1109 ("Q: It's your testimony that using a fake name wasn't meant to confuse, right? A: Yes, exactly.")). In fact, Gillier used a web of fake identities and alter-ego companies specifically for the purpose of confusing and defrauding Honeywell. The record evidence also demonstrated that Gillier knew that flooding Honeywell with checks made it appear that RTF had a positive balance at Honeywell. In a call with a Honeywell, the defendant falsely claimed that "[c]urrently, Honeywell owes us half a million dollars." (*See* GX-111T at 2).

10

- Gillier testified that his computer was a "company computer" and that, as a result, "everybody could use my computer." (Tr. at 1029.) In fact, as the defendant stipulated as a fact for the trial, he was the sole user of the computer.

To reach its verdict, the jury necessarily found that the defendant intentionally lied to Honeywell about his intention to pay for aircraft parts. Accordingly, the defendant's testimony to the contrary was false.

### III.   A SENTENCE OF NO LESS THAN 120 MONTHS' IMPRISONMENT IS FAIR AND APPROPRIATE

A substantial term of incarceration is necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense and to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a).

#### A.   Applicable Law

The United States Sentencing Guidelines continue to provide strong guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 128 S. Ct. 586, 596 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the Sentencing

11

Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). *See Gall*, 128 S. Ct. at 596 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### A. The Seriousness of the Offense

A significant sentence, as contemplated by the Guidelines, would reflect the seriousness of the offense, promote respect for the law, and provide just punishment. As to the nature and circumstances of the offense, the defendant's crime was quite serious.

Fist, the defendant's actions were not simply an isolated lapse of judgment made in a singular moment of weakness. Rather, Gillier's crime consisted of a sustained course of conduct that spanned years, where he was a full participant in defrauding victim-businesses. While Gillier repeatedly attempted to shift responsibility for his actions to his former co-defendant during trial, Gillier was already using fictitious personae, fake signatures, and fraudulent references to deceive other businesses as early as 2003, in connection with a business that Gillier ran alone and that "Tari had nothing to do with," as Gillier admitted during cross-examination. (Tr. 1073-75). Gillier continued his fraudulent conduct for years, including while Tari was "possibl[y]" in a coma, and ran all operational aspects of RTF's fraud. (Tr. 1091). Finally, that the available financial records

12

show Tari receiving more funds, as Gillier repeatedly noted at trial, is no more a defense at sentencing than it was at trial. At best, Gillier was the key conduit for sequestering those fraud proceeds abroad, even if not directly to himself. And there is no way to know from the available records whether Gillier was receiving additional payments from Tari after the fraud funds were transferred out of the country. In any event, including the transfers to accounts in the names of entities for which Gillier was the sole signatory, Gillier still received hundreds of thousands of dollars in stolen money. (GX 1502, at 4 (showing Gillier-controlled accounts received over $300,000 from RTF's bank account at HSBC between 2004 and 2006)).

Second, Gillier's efforts to avoid responsibility for his actions were even longer-lasting than his fraud scheme; indeed, those efforts to evade responsibility continued through conviction at trial. One day after the civil seizures at the Doha Warehouse and the Gillier Residence, where Gillier was served with Honeywell's civil complaint, Gillier fled the United States and never voluntarily returned to the country. He refused to appear for depositions and even appeared to self-induce fabricated medical conditions. In 2010—the same year that Gillier was charged in a criminal complaint in this District, which was the subject of a press release—Gillier returned to Belgium, a country that does not extradite its own citizens.[2] Years later, Gillier was finally arrested in Italy, but even then did not accept responsibility, contesting extradition, going to trial, and testifying to falsehoods at that trial. Among other things, Gillier claimed he thought the Honeywell parts were paid for, and blamed Tari again. (*E.g.*, Tr. 1101 ("All the parts that arrived and which were produced, that were fabricated—billed, they were billed by a final invoice of Honeywell and they were all paid for, and this is what Tari always said to me, which always he guaranteed me.

---

[2] Between 2006 and 2010, Gillier appears to have told the assigned Probation Officer that he was unemployed and was supported by friends and family. (PSR ¶ 87). In fact, Gillier was still involved in the same fraud scheme, with Tari taking the lead in the United States.

13

And I was stupid, I believed him.")). Gillier's blame shifting and excuses in his trial testimony (years and years later) were merely more lies—once again offered to serve his own self-interests, this time, under oath in a federal courtroom.

Viewed in context, the offense of conviction was serious, the defendant was essential to its commission, and he continued to lie at trial.

### B. History and Characteristics of the Defendant and Specific Deterrence

Gillier's history and characteristics do not weigh against a significant sentence. According to the PSR, Gillier was provided the foundations for avoiding a life of crime. He received an international education, traveling in different countries, learning multiple languages, and even received a Master's Degree in International Business. (PSR ¶¶ 84-85). Thereafter, he worked in business roles at legitimate companies in several different countries. His transition from legitimate work to the fraud schemes around 2003 is left essentially unexplained; according to the PSR he quit his job at Lorien in 2004 "voluntarily for a more lucrative job opportunity." (PSR ¶ 89). It is concerning that Gillier—unlike some defendants who appear before this Court—had the opportunity, the education, and the professional background to engage in legitimate employment and, for a number of years, simply chose not to do so.

The defendant repeatedly insists that he was a "pawn" in Tari's scheme. (Def. Mem. at 1, 12). He also submits that he is uniquely vulnerable to manipulation by others. (*Id.* at 11). That rings hollow. While Gillier may not be some sort of criminal mastermind, the record evidence shows that Gillier—an educated, business-savvy person who had previously worked in a number

of corporate roles—was a full and knowing participant in the scheme, and even engaged in fraudulent conduct prior to, and independent of, Tari, as noted above.

### D. General Deterrence Warrants a Significant Sentence

A significant sentence serves the interest of general deterrence and promotes respect for the law in the public. Such a sentence would send an important message that fleeing from justice, much less seeking to obstruct it through perjured testimony, does not entitle a criminal defendant to a break. Nor should a defendant get a break for stealing "only" through lies and false records—for being a "white collar" defendant. In fact, general deterrence favors a significant sentence in such cases. *See United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (noting that legislative history of Section 3553(a) supports conclusion that "Congress viewed deterrence as 'particularly important in the area of white collar crime,'" and that "[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence"); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").

**III.   CONCLUSION**

For these reasons, and all the reasons set forth above, the Government respectfully submits that a sentence of no less than 120 months' imprisonment for this defendant is sufficient, but not greater than necessary, to achieve the legitimate goals of sentencing.

>                             Respectfully submitted,
>
>                             DAMIAN WILLIAMS
>                             United States Attorney
>
>
> By:        /s/
>          Micah F. Fergenson
>          Dina McLeod
>          Assistant United States Attorneys
>          (212) 637-2190 / -1040


cc:   Lee Ginsberg, Esq. (by email and ECF)
      Nadjia Limani, Esq. (by email and ECF)